CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED
JUL 13 2018
JULIA C. DUDLEY, CLERK
BY: s/ MARTHA L. HUPP
     DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| CARLA COOK MAJURE, | ) | |
| Plaintiff, | ) | Case No. 4:17-cv-00033 |
| v. | ) | **MEMORANDUM OPINION** |
| PRIMLAND, LTD, | ) | By: Hon. Jackson L. Kiser |
| Defendant. | ) | Senior United States District Judge |

This matter is before the Court on Defendant Primland, LTD's Motion for Summary Judgment [ECF No. 124] and Motion for Partial Summary Judgment [ECF No. 129]. Both motions were fully briefed by the parties, and I heard oral argument on the motions on June 12, 2018. I have considered the evidence, arguments of the parties, and the applicable law. For the reasons stated herein, both motions will be denied.

**I.  STATEMENT OF FACTS AND PROCEDURAL BACKGROUND**

Pursuant to the appropriate standard of review, the facts are recounted in the light most favorable to Plaintiff, the party opposing summary judgment. See Scott v. Harris, 550 U.S. 372, 380 (2007).

Plaintiff Carla Majure ("Plaintiff") is a former spa owner with past employment history at both Sara Lee and Ralph Lauren making $300,000 a year. In 2007, Plaintiff opened her own spa, Majure Skin Care, which, in addition to traditional spa services, offered services that could only be offered under the care of a physician.[1] Plaintiff served as general manager of Majure Skin Care and designed the building, hired and trained the staff, and ran the day-to-day operations of the spa. Under Plaintiff's leadership, Majure Skin Care grew from six employees to over fifty,

---

[1] Plaintiff's husband and business partner at Majure Skin Care is a licensed physician.

achieved annual revenue of $1.2 million, and was named one of the Top 5 Best of the Best New Spas in the nation in 2008.

After several years in the business, Plaintiff's husband began expanding his medical practice and, in 2013, the spa side of the business was closed to focus on the primary care aspect of the business. In 2015, the business was sold for $2.4 million.

At some point in February or March of 2016, Plaintiff became aware of a job opening for the position of Spa Manager at Defendant Primland, LTD's ("Primland") luxury resort in Meadows of Dan, Virginia, near the Blue Ridge Parkway. On March 14, Plaintiff applied for the position. Penny Morgan ("Morgan"), the Human Resources Director at Primland, received Plaintiff's application and passed it along to Mara Bouvier ("Bouvier"), Primland's General Manager. At Bouvier's direction, Morgan called Plaintiff on March 15 and they discussed the position and Plaintiff's qualifications. They also discussed the salary range for the position. Plaintiff thought the salary would be between $80,000 and $120,000, but Morgan did not confirm any salary range. Morgan told Plaintiff that, although the salary would not be that high, the position would come with benefits and flexibility. Morgan told Plaintiff: "[Y]ou could do this job in your sleep." (Carla Majure Decl. ¶ 5, May 25, 2018 [ECF No. 140-44].)[2]

Morgan scheduled an interview for Plaintiff and Bouvier. On the morning of the interview, Morgan called to cancel because of a scheduling conflict. The interview was rescheduled for March 23. According to Plaintiff, that interview was a disaster. She contends Bouvier had an immediate, visceral reaction the moment she laid eyes on Plaintiff. Plaintiff claims Bouvier was hostile, stood over her, and was confrontational. Plaintiff contends that Bouvier's "questions were all phrased in a negative way such as, 'What makes you think you

---

[2] Primland objects to Plaintiff's declaration, arguing that it is "self-serving" and in conflict with her deposition. Primland has not, however, pointed to any contradiction. At this stage, I accept Plaintiff's testimony as accurate.

know anything about running a spa?'" (Carla Majure Dep. 163:18–20, Feb., 26, 2018 [ECF No. 140-1].) When Plaintiff spoke with Morgan after the interview and described Bouvier's demeanor, Morgan told Plaintiff that was not normal behavior for Bouvier. Although Plaintiff expressed her desire to withdraw her application (see Majure Decl. ¶ 6), Morgan convinced her to continue with the interview process.

Additionally, during the interview, Bouvier told Plaintiff that she would be required to get spa treatments in order to continue the interview process; Plaintiff contends that Bouvier did not mention that Primland would pay for the services. When she discussed this requirement with Morgan after the interview, Morgan told Plaintiff that no candidate had ever been required to do that. Ultimately, Plaintiff was not charged for the services.

After receiving the free spa treatments on April 1, Plaintiff contends she had to follow-up several times to schedule her second interview with Bouvier. Although Bouvier sat down during that interview, Plaintiff still describes the encounter as bad.[3] During their meeting, Plaintiff and Bouvier discussed Zack Groff, the interim spa manager. According to Plaintiff, Bouvier told her that "part of the reason she put Zack in that [spa manager] position was because he's male, and if she had her preference she would hire a male to control this mostly female staff." (Majure Dep. 171:14–18.) When Plaintiff and Bouvier discussed salary, Bouvier told Plaintiff the salary range would be between $50,000 and $55,000 per year, plus bonus.

After the second interview, Plaintiff spoke with Morgan again. Morgan confirmed that Bouvier wanted a young male for the position. (Majure Decl. ¶ 7.) Morgan told Plaintiff that, although Bouvier wanted a man and did not want her, Morgan felt Plaintiff was the most qualified for the position and Morgan was pushing internally for her to get the position.

---

[3] In emails and Facebook messages sent after the fact to Morgan and Plaintiff's friend Brenda Schwartz, who is a former lead massage therapist at Primland, Plaintiff described the meeting as "nice" and "good." (See Pl.'s Mem. in Supp. of Pl.'s Mot. for Summ J. Exs. 26, 35 [ECF Nos. 125-26, 125-35].)

Bouvier next contacted Plaintiff and asked her to interview with Jean-Jacques Devaux, the Managing Director of PrimWest's Geneva office, the next week.[4] Plaintiff understood that it would be a remote interview. On the morning of the scheduled interview, Plaintiff emailed Bouvier and asked if she should expect a call, or if she should she call in. Bouvier responded that the meeting would be on-site at Primland. Bouvier ended the email: "Good thing you reached out." While rushing to return to Primland to make the interview, Plaintiff called Morgan and told her she made a mistake and misunderstood how the interview would be conducted. Plaintiff claims Morgan told her she did not make a mistake; Bouvier misled her on purpose so that Plaintiff would not show for the interview. Nevertheless, Plaintiff arrived on time and the interview with Devaux went well.

At her final interview on April 15, Bouvier told Plaintiff that, if she made her an offer, it would be for $48,000 per year, below the salary range she previously quoted to Plaintiff. She also told Plaintiff she would be required to report to work from 8:30–6:00 daily, a condition Morgan told Plaintiff had never been imposed on a previous spa manager. This was at odds with Plaintiff's understanding from her conversations with Morgan, who told Plaintiff the job offered flexibility.[5] Bouvier also allegedly told Plaintiff there were daily issues with the female staff, and that she had told Steve Helms, the Vice President of Primland, she was going to tell Plaintiff all the bad things about the job so Plaintiff would reject any offer Bouvier made.

Following that meeting, Plaintiff and Morgan spoke again. According to Plaintiff, Morgan told her that she would not be hired because Bouvier wanted a male for the position and

---

[4] The parties do not explain what relationship PrimWest has with Primland. Primland's Corporate Disclosure Statement does not indicate that PrimWest is Primland's parent company. [See ECF No. 8.]

[5] In an email with Morgan after they initially spoke about the position, Plaintiff reiterated that she wanted to find a position that offered flexibility. (See Def.'s Mem. in Opp. to Pl.'s Mot. for Summ. J. Ex. 15 [ECF No. 140].)

that, even if Bouvier did hire Plaintiff, Bouvier would make her miserable so that she would quit. (Majure Decl. ¶ 18.)

The next week, on April 19, Plaintiff received an offer letter from Primland.[6] The terms included a salary of $48,000 per year, plus a maximum annual bonus of $5,000.[7] There would also be a 90-day probationary period. Based on her past conversations Plaintiff with Bouvier and Morgan, Plaintiff felt unwanted and that she would be "run off" if she accepted the offer.

In a phone call with Morgan after she received the offer, Morgan told Plaintiff that Primland had never capped the spa manager's bonus in the past. Although Plaintiff secretly recorded part of the conversation, she asserts that, after the recorder was turned off, Morgan threatened her life if she told anyone what Morgan had told her:

> She told me that she was happy in her job and had finally bought a house. She said she is not going to let me or this thing with me make her lose her job or home. And threatened me that she had guns and knew where I lived because of my resume [*sic*]. I took Penny's threats seriously, and still do. Before we [hung] up, I stated that I would not accept the fake offer or communicate with anyone further at Primland about the job.

(Majure Decl. ¶ 23.)

Despite what Morgan told her and what Plaintiff felt about Bouvier, Plaintiff emailed Bouvier after receiving the offer[8] and asked: (1) whether the bonus was capped; and (2) whether the first 90 days were considered a trial period of employment. Bouvier responded that the bonus program is a sliding scale and that additional payouts can occur if the goals are exceeded.

---

[6] Plaintiff believes the offer was a "sham," and that Bouvier never intended for her to accept it.

[7] Following her initial phone call with Plaintiff, Morgan emailed Bouvier and said, "We talked a little bit about salary requirements. . . . She's very negotiable, and I think we could get her between 45 and 50." (Penny Morgan Dep. 202:20–203:16, Feb. 27, 2018 [ECF No. 125-2].)

[8] It is unclear whether Plaintiff emailed Bouvier before or after she claims Morgan threatened her life.

Bouvier also offered to send Plaintiff the "bonus schematic" while she considered the offer. Plaintiff never responded to Bouvier's email or the offer letter.

The next day following their phone conversation, Morgan followed up by text message and told Plaintiff that she had looked at the payroll and that bonuses *were* capped. Later that day, she followed up and inquired if Plaintiff had accepted the offer. Plaintiff told her, "I want to do it. Just concerned, since she [Bouvier] doesn't really want me." Morgan responded: "Trust me, she wouldn't have sent the offer if she didn't." (Id. ¶ 24.)

Bouvier followed up with Plaintiff on April 23, 2016, four days after sending the offer letter, and asked whether Plaintiff had additional questions about the position:

> Hello Carla, Just wondering if you have any more questions? Would you like to schedule a call or meeting? Hoping you don't have bad news for us."

(Majure Dep. 277:12–278:21.) Plaintiff did not respond to that email.

On April 26, Brenda Schwartz sent Plaintiff a Facebook message:

> Hey, Carla, I don't know if you heard from Mara [Bouvier] or not, but I have a feeling she might offer you the manager's position. She spoke very highly of you.

(Id. 125:23–126:1.) And Morgan sent Plaintiff a text message the same day:

> Mara and I talked about you today and we are both perplexed by your silence. Did we do something to upset you as neither of us can figure out why you aren't speaking to us?
>
> And btw [by the way]… Mara does think as well as I do that you would be great for the spa!

(Pl.'s Mem. in Supp. of Pl.'s Mot. for Summ. J. Ex. 39 [ECF No. 125-39].) Plaintiff did not respond to Schwartz or Morgan.

Ultimately, Bouvier interpreted Plaintiff's silence as a rejection of the offer. In June, Billy Smith arrived at Primland for an interview, which included: dinner at elements on Friday,

June 3; breakfast with Steve Helms, a property tour with Bouvier, and dinner at Stables Saloon on Saturday; and breakfast at elements with two 60-minute Swedish massages on Sunday prior to his departure. (Def.'s Mem. in Opp. to Pl.'s Mot. for Summ. J. Ex. 7 [ECF No. 140-7].) Smith was ultimately hired as Spa Manager, and was given a base salary of $68,000, $10,000 in possible bonuses, $7,500 in relocation expenses, and "up to 4 months temporary housing" for him while he transitioned to the area. (Id. Ex. 21 [ECF No. 140-21].)

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission, and her Notice of Rights letter was mailed to her on February 14, 2017. She filed suit, *pro se*, in this Court on May 16, and subsequently retained counsel. Primland filed its Motion for Summary Judgment on May 7, 2018, and its Motion for Partial Summary Judgment on May 14. [ECF Nos. 124, 129.] Plaintiff responded to both motions [ECF Nos. 140, 143], and Primland replied [ECF Nos. 149, 152]. Primland also filed objections to Plaintiff's Brief in Opposition [ECF No. 153], see Fed. R. Civ. P. 56(c)(2), to which Plaintiff responded [ECF No. 156], and Primland replied [ECF No. 160]. I heard oral arguments on both motions on June 12, 2018. I have reviewed all the evidence and arguments of the parties, as well as the applicable law. The motions are ripe for disposition.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); George & Co. LLC v. Imagination Entm't Ltd., 575 F.3d 383, 392 (4th Cir. 2009). A genuine dispute of material fact exists "[w]here the record taken as a whole could…lead a rational trier of fact to find for the nonmoving party." Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (internal quotation marks and citing reference omitted); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A

genuine dispute cannot be created where there is only a scintilla of evidence favoring the nonmovant; rather, the Court must look to the quantum of proof applicable to the claim to determine whether a genuine dispute exists. Scott, 550 U.S. at 380; Anderson, 477 U.S. at 249−50, 254. Not every factual dispute will defeat a summary judgment motion; there must be a *genuine* dispute over a *material* fact. Anderson, 477 U.S. at 247–48. A fact is material where it might affect the outcome of the case in light of the controlling law. Id. at 248. On a motion for summary judgment, the facts are taken in the light most favorable to the non-moving party insofar as there is a genuine dispute about those facts. Scott, 550 U.S. at 380. At this stage, however, the Court's role is not to weigh the evidence, but simply to determine whether a genuine dispute exists making it appropriate for the case to proceed to trial. Anderson, 477 U.S. at 249.

## III. DISCUSSION

### a. Primland's Motion for Summary Judgment

Plaintiff has brought a claim of sex discrimination against Primland under Title VII of the Civil Rights Act of 1964. In essence, she claims she was offered the position of Spa Manager at a lower salary and subject to terms that were ultimately designed to get her to not accept the position so that a man could be hired.

Plaintiff's allegations are most analogous to a disparate treatment case wherein an employee, or in this case an applicant, has been treated "less favorably than others because of a protected trait." Ricci v. DeStefano, 557 U.S. 557, 577 (2009) (internal quotation omitted). In order to prevail, Plaintiff must establish "'that the defendant had a discriminatory intent or motive' for taking a job related action." Raytheon Co. v. Hernandez, 540 U.S. 44, 52 (2003) (citation omitted). "The ultimate question in every disparate treatment case is whether the

plaintiff was the victim of intentional discrimination." Reeves v. Sanderson Plumbing Prods., Inc., 520 U.S. 133, 135 (2000). Liability will turn on "whether the protected trait . . . actually motivated the employer's decision." Raytheon Co., 540 U.S. at 52 (internal quotation omitted).

At trial, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Tx. Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981). With regards to intentional discrimination, Plaintiff may prove her case by either direct or circumstantial evidence. See U.S. Postal Serv. Bd. of Governors v. Aiken, 460 U.S. 711, 714 n.3 (1983).

"Applying the usual Title VII analytical construction for sex discrimination claims," a court should "first consider whether [the plaintiff] has shown any direct evidence of discrimination." Young v. United Parcel Serv., Inc., 707 F.3d 437, 466 (4th Cir. 2013), rev'd on other grounds 135 S. Ct. 1338 (2015). A plaintiff may also present indirect evidence of the alleged discriminatory animus. See Hill v. Lockheed Martin Logistics Management, Inc., 354 F.3d 277, 284 (4th Cir. 2004), abrogated on other grounds by Univ. of Tx. Sw. Med. Ctr. v. Nasser, 570 U.S. 338 (2013). "Direct evidence must be evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 520 (4th Cir. 2006).

In the absence of direct evidence that a decision was based on some protected characteristic of the plaintiff, a Title VII plaintiff may utilize the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and its progeny, recognizing that the burden of proof remains with the plaintiff at all times. See Young, 135 S. Ct. at 1345; Burdine, 450 U.S. at 253. Although the McDonnell Douglas proof scheme applies only at trial,

it can appropriately guide a court's consideration of the evidence at the summary judgment stage. See Pettis v. Nottoway Cnty. Sch. Bd., 592 F. App'x 158, 160 (4th Cir. 2014).

In the absence of direct evidence of discrimination, "a plaintiff may create a rebuttable presumption of discrimination by establishing, by a preponderance of evidence, a 'prima facie case' of discrimination." Pettaway-Darden v. Woodbourne Center, Inc., No. ELH-16-3100, 2017 WL 5885658, at *14 (D. Md. Nov. 28, 2017). Although the exact formulation of the required prima facie showing will vary according to the unique factual circumstances presented in each case, see McDonnell Douglas, 411 U.S. at 802 n.13, the plaintiff is usually required to show that an employer took adverse action against an qualified applicant "under circumstances which would give rise to an inference of unlawful discrimination," Burdine, 450 U.S. at 253. Accord Plotke v. White, 405 F.3d 1092, 1099 (10th Cir. 2005) (noting that the "articulation of a plaintiff's prima facie case may well vary, depending on the context of the claim and the nature of the adverse employment action alleged").

In a failure-to-hire case, the plaintiff establishes a prima facie case by showing: (1) she is a member of a protected class; (2) she applied for a vacant position; (3) she was qualified for the position; and (4) she was rejected for the position under circumstances giving rise to an inference of unlawful discrimination. See Amirmokri v. Balt. Gas & Elec. Co., 60 F.3d 1126, 1129 (4th Cir. 1995) (analyzing the plaintiff's Title VII failure-to-promote claim based on national origin).

If the plaintiff makes the necessary showing, the burden the shifts to the defendant to "articulate some legitimate, non-discriminatory reason" for its actions. Young, 135 S. Ct. at 1345. Once the defendant makes its showing, "through the introduction of admissible evidence," "the presumption raised by the prima facie case is rebutted," Burdine, 450 U.S. at 255, and "drops from the case . . . ." Id. at 255 n.10. "Stated another way, if the employer produces

evidence that could persuade a fact finder that it had a legitimate, non-discriminatory reason for its actions, 'the defendant has done everything that would be required of [it] if the plaintiff had properly made out a prima facie case,' and therefore, 'whether the plaintiff really did so is no longer relevant.'" Pettaway-Darden, 2017 WL 5885658, at *14 (quoting U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983)).

Once the defendant has made the required showing, the plaintiff must then "'prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" Reeves, 530 U.S. at 143 (quoting Burdine, 450 U.S. at 253). To show pretext, "a plaintiff must offer sufficient evidence such that a reasonable trier of fact could conclude that the employer's explanation is false or 'unworthy of credence,' and that discrimination was the true reason for the adverse employment action." Pettaway-Darden, 2017 WL 5885658, at *15 (internal citations omitted).

"When the question at issue is whether the 'decision maker' acted with discriminatory animus, only the 'perception of the decision maker' is 'relevant' to the question." Id. (quoting Hux v. City of Newport News, Va., 451 F.3d 311, 319 (4th Cir. 2006)). It is not the court or the jury's job to decide "whether an employer's reason [for failing to hire] an employee was wise, fair, or even correct, ultimately, so long as it truly was the reason for the" employer's decision. Walker v. Mod-U-Kraf Homes, LLC, 775 F.3d 202, 211 (4th Cir. 2014).

Before I reach the merits, I pause to make one observation: Plaintiff incorrectly argues that I "held," in ruling on Primland's Motion to Dismiss, that she has proven direct evidence of discrimination. I have done no such thing. I merely held that her Complaint *stated* that she had direct evidence of discrimination. No quantum of proof was applicable to her pleadings, and I have not, up until this point, held that she has proven *anything*. Considering the evidence she has

presented at this point, I think she has carried her burden under the McDonnell Douglas framework, and will deny summary judgment on that basis.

Turning to the evidence before the Court, Plaintiff must first establish a prima facie case by showing: (1) she is a member of a protected class; (2) she applied for a vacant position; (3) she was qualified for the position; and (4) she was rejected for the position under circumstances giving rise to an inference of unlawful discrimination. There is no dispute as to the first three prongs; Plaintiff, a female, applied for an open position for which she was qualified. All that is in dispute, then, is whether she was "rejected" under circumstances giving rise to an inference of discrimination.

As to whether Plaintiff was "rejected:" Primland argues Plaintiff was not "rejected" because it made her an offer of employment she refused to accept. Plaintiff counters that the offer was a "sham offer" Primland wanted her to reject. She contends that accepting the offer would have been a "futile gesture" because she knew would be the victim of unfair and unreasonable demands designed to force her to quit so that Bouvier could hire a man for the position.

The "futile gesture" doctrine "was first recognized in International Brotherhood of Teamsters v. United States, 431 U.S. 324 (1977), where there Supreme Court affirmed a finding that a common carrier and a union had violated Title VII by discriminatory hiring and promotion policies." Pinchback v. Armistead Homes, Corp., 907 F.2d 1447, 1451 (4th Cir. 1990). There, the company argued that certain employees' failure to apply for promotions because the "company's discriminatory practices were well known to them" did not bar the employees from relief. Id. In deciding which employees were entitled to relief, the Supreme Court stated:

> [T]he company's assertion that a person who has not actually applied for a job can *never* be awarded seniority relief cannot

> prevail. . . . A consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection. . . . When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who does through the motions of submitting an application.

Int'l Brotherhood, 431 U.S. at 365–66. Primland maintains that the "futile gesture" doctrine does not excuse Plaintiff's rejection of its valid employment offer because Plaintiff did not face "explicit and certain rejection," id. at 365, and because other females had previously been accepted for the same or similar position.

Primland's argument ignores the statements made to Plaintiff by Penny Morgan, Primland's HR Director, and Mara Bouvier, the hiring authority.[9] According to Plaintiff, both Morgan and Bouvier told Plaintiff that Bouvier wanted a male in the position. Plaintiff testified

---

[9] Primland argues in its reply brief [ECF No. 149], as well as in an objection to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment [ECF No. 153], see Fed. R. Civ. P. 56(c)(2), that Morgan's statements to Plaintiff are hearsay, not subject to any exception, and cannot be considered. Under Fed. R. Evid. 801(d)(2)(D), a statement is not hearsay if it is offered against an opposing party and "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed . . . ." Here, at the time she made the statements at issue, Morgan was Primland's HR Director. In that role, she was familiar with the requirements for the position and even conducted a pre-screening interview with Plaintiff at Bouvier's direction. Despite the fact that she did not have authority to hire or fire, as human resources director, the requirements of the job for which Plaintiff was applying were certainly within the realm of her agency at Primland. She had spoken with Plaintiff previously about the position and the requirements, and even opined that Plaintiff could perform the job with ease. Her statements about Bouvier's preferences for the position, therefore, are not hearsay, because they concerned the so-called requirements of the position. Cf. Sutton v. Roth, LLC, 361 F. App'x 543, 547–47 (4th Cir. 2010) (unpublished). See also Back v. Nestle USA, Inc., 694 F.3d 571, 577 (6th Cir. 2012) (statements of HR director were not hearsay); Makowski v. SmithAmundsen LLC, 662 F.3d 818, 823 (7th Cir. 2011) (same); Carter v. Univ. of Toledo, 349 F.3d 269, 272, 276 (6th Cir. 2003) (holding university vice provost's statement that higher administrators were trying to get rid of black professors fell within the scope of his employment relationship because his job entailed ensuring compliance with affirmative action requirements); Taylor v. Dollar General Corp., No. 14-77-ART, 2015 WL 3872341, at *4–6 (E.D. Ky. June 23, 2015) (discussing Back); Haskell v. Cook Cnty. Housing Auth., No. , 2013 WL 1943275, at *6 (N.D. Ill. May 9, 2013) (statements of HR director were not hearsay); Niesse v. General Elec. Co., No. IP 99-1457-C-T/G, 2001 WL 290382, at *2 (S.D. Ind. Jan. 31, 2001) (same).

Moreover, even if Morgan's statements were not considered, Primland has still failed to counter Plaintiff's testimony that Bouvier told Plaintiff she wanted to hire a man for the job. At this stage, that evidence is accepted as true.

that Bouvier said "she wanted [to] hire a male for the full-time spa position." (Carla Majure Dep. 172:2–3, Feb. 26, 2018.) Morgan went further, confirming what Bouvier said and adding that Bouvier would impose unreasonable demands on Plaintiff until she quit. According to Plaintiff, Morgan told her that Bouvier would "do everything that she can to run you off" because Bouvier had come to the conclusion that only a male could control the mostly female staff. (Id. at 188:4–7.) Plaintiff's testimony about Bouvier and Morgan's comments, taken as true at this stage, forms an adequate basis to conclude that Plaintiff would face "explicit and certain rejection" if she accepted the offer at Primland. Thus, accepting the offer would have been futile, and Plaintiff's refusal of the position does not doom her claim.

Primland astonishingly argues that no one has "testified" that Bouvier said she wanted a male for the spa manager position. (See, e.g., Def.'s Reply to Pl.'s Mem. in Opp. to Def.'s Evid. Obj. to Pl.'s Mem. in Opp to Mot. for Summ. J. pgs. 3–4, June 22, 2018 [ECF No. 160] ("[N]ot a single witness has testified that Bouvier had a personal preference to hire a male Spa Manager . . . .").) That is a glaringly false assertion for Primland to make. At her deposition, taken under oath, Plaintiff testified as follows:

> A: [Bouvier] expressed two things. She expressed that she wanted the interim manager—that the reason that she had put a male in the position was because he was male, and ***she expressed that she wanted to hire a male for the full-time spa position***.
> Q: Okay. ***She told you that?***
> A: ***She did.*** It was shocking.

(Majure Dep. 171:23–172:5 (emphasis added).) Primland seems to contend that, on a summary judgment motion, I should accept the evidence it likes and ignore the rest. The law does not work that way.

The next question to answer is whether facts give rise to an inference of unlawful discrimination. The answer must be yes. Taken in the light most favorable to Plaintiff, she applied for a position and was told by Bouvier, the decision-maker, that she wanted a male for the position. Morgan confirmed that desire, telling Plaintiff that Bouvier would "run her off" so she could hire a man. Plaintiff received an offer for $48,000 per year, plus $5,000 bonus potential, for a total salary of $53,000. Plaintiff did not accept that offer, deeming it to be "fake," according to her deposition.[10] Thereafter, a male applicant was hired at $68,000 per year, plus $10,000 bonus potential, for a total salary of $78,000. That represents a total salary that is almost 150% of what was offered to Plaintiff. Taken in conjunction, all of these facts, at a minimum, raise the inference that Plaintiff was not wanted at Primland because she was a woman. Accordingly, at this stage, Plaintiff has satisfied the "relatively easy test" of showing that she, a qualified applicant, "was rejected under circumstances which give rise to an inference of unlawful discrimination." Young v. Lehman, 748 F.2d 194, 197 (4th Cir.), cert. denied 471 U.S. 1061 (1985). She has presented sufficient evidence to establish her prima facie case.

The burden then shifts to Primland to offer a legitimate, non-discriminatory reason for its actions. It offers no defense to the statements of Bouvier and Morgan, aside from their denials, but counters that it hires and promotes women all the time. This is true, and commendable, but ultimately it does not defeat Plaintiff's claim. It does not matter that *other* women are not discriminated against at Primland; what matters is whether Primland discriminated against *this* woman. Plaintiff's evidence at this point suggests that Bouvier, after having several female spa managers, became convinced that a female could not perform the job. As a result, she wanted a

---

[10] Plaintiff testified that she believed an appropriate salary range was $80,000 to $120,000 per year. Nevertheless, she remained interested in the position even after receiving the offer because she valued other intrinsic benefits of employment at Primland, such as the flexibility she believed the position offered. According to Plaintiff, further conversations with Bouvier chipped away at those other benefits, leaving Plaintiff to walk away from Primland's offer.

male for the spa manager position. To that end, she installed a male interim manager and unequivocally stated her preference for a man as spa manager. Primland's argument would create an immunity in the law where none exists. To hold as Primland suggests would permit a company to discriminate in certain departments as long as it treated everyone fairly in others. Surely it cannot be that a law firm could refuse to hire female attorneys merely because the administrative staff is over 75% female.

Primland next argues that Billy Smith's past experiences justified the pay differential. No doubt different applicants' work experience makes them more or less valuable to prospective employers. "Job performance and relative employee qualifications are widely recognized as valid, non-discriminatory bases for any adverse employment decision." Evans v. Tech. Applications & Serv. Co., 80 F.3d 954, 960 (4th Cir. 1996) (citing Burdine, 450 U.S. at 258–59). Because Primland has "discretion to choose among equally qualified candidates provided the decision is not based on unlawful criteria," Wileman v. Frank, 979 F.2d 30, 38 (4th Cir. 1992), the onus falls on Plaintiff to show that the rationale offered by Primland was a pretext for discrimination.

According to Plaintiff's evidence, she had many years running and managing her own spa, growing the annual revenue to $1.2 million and being named one of the Top 5 best new spas in the nation in 2008, while Billy Smith had one year of experience managing a luxury spa. Whether and to what extent Smith's past salon experience applies to the job of luxury spa manager is not for this court to say as a matter of law. Also it is not for the court to say, as a matter of law, that Smith's experience justified a salary that was 150% of the salary offered to Plaintiff. Taking the evidence in the light most favorable to Plaintiff, there is evidence to suggest that the different past work experiences do not justify the disparate salaries offered to the two

candidates. That, however, is not grounds to deny summary judgment. Plaintiff's opinions about her relative qualifications do not have "probative force to reflect a genuine issue of material fact." Evans, 80 F.3d at 960 (quoting Goldberg v. B. Green and Co., Inc., 836 F.2d 845, 848 (4th Cir. 1988)).

The most damning evidence, at this stage, is Bouvier's statement to Plaintiff that she wanted a man for the spa manager position. That statement, coupled with the salary differential and the differing treatment during the interview processes,[11] is evidence that Primland's proffered reasons for its actions are pretext for Bouvier's stated preference for a man. At a minimum, Plaintiff has offered evidence that, "as between her sex and" Primland's explanation, "her sex was the more likely reason for" the difference in treatment. Evans, 80 F.3d at 960. In light of that, Primland is not entitled to summary judgment on Plaintiff's claim of sex discrimination. That question will be left for a jury to decide.

### b. Primland's Motion for Partial Summary Judgment

Primland has also moved for partial summary judgment on the issue of damages. In its Motion, Primland contends that it would have rescinded Plaintiff's job offer had it known about (1) her personal bankruptcy action and failure to pay payroll taxes at her prior business, or (2) her dishonesty in lying about secretly tape-recording a telephone conversation with Penny Morgan, Primland's then and current Human Resources manager.

Primland correctly notes that damages may be limited in cases when after-acquired evidence establishes an employee's wrongdoing that would have resulted in her termination (or, as in this case, the rescission of her job offer). See McKennon v. Nashville Banner Pub. Co., 513 U.S. 352, 360–63 (1995). "Where an employer seeks to rely upon after-acquired evidence of

---

[11] Plaintiff testified that she had to push to get the bare minimums from Bouvier, such as paying for the spa treatments and a follow-up interview. In contrast, Smith's treatment while at Primland appears markedly different and better. [See ECF No. 140-7.]

wrongdoing, it must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." Id. at 362–63. It is on this point that Primland has failed to carry its burden.

Primland asserts that Plaintiff's "poor financial management" of her personal finances would have justified terminating her (or not offering her the position of spa manager) had it known about it at the time. The evidence, taken in the light most favorable to Plaintiff, cannot support this contention. Billy Smith, the man hired to when Plaintiff did not accept Primland's job offer, filed for bankruptcy before working for Primland. (Billy Smith Dep. 7:15–8:3, Mar. 27, 2018 [ECF No. 140-48].) The evidence is certainly in conflict, then, whether a spa manager's past bankruptcy is "of such a severity that the employee in fact would have been terminated on those grounds alone . . . ." McKennon, 513 U.S. at 362–63.

Primland argues that it was not Plaintiff's bankruptcy, but her failure to pay payroll taxes on her employees when she ran her own spa, that would have justified her rescinding the offer or terminating her had she accepted its offer. Again, the evidence is in conflict as to whether and to what extent Plaintiff's issues with the IRS would have resulted in the rescission of her offer or termination of her employment. As Steve Helms testified, he would "want to know more" about the circumstances surrounding the non-payment (or delayed payment) of payroll taxes if Billy Smith had failed to pay them. (Steve Helms Dep. 133:6–134:11, Apr. 18, 2018 [ECF No. 140-46].) Moreover, the spa manager is not responsible for paying payroll taxes. (Id. at 134:22–135:1.) At this stage, the evidence does not support Primland's contention that non-payment of payroll taxes at a previous employment is *per se* disqualifying.

Even more glaring is the inconsistency in Primland's contention that Plaintiff's lie about tape-recording her conversation with Penny Morgan is grounds for dismissal. Primland asserts that, according to its handbook, "dishonesty . . . is so egregious or serious that . . . [it] may result in immediate termination of employment." Nevertheless, the evidence is uncontroverted that Morgan, its *current* HR manager, lied under oath in her deposition in this action, yet has retained her employment at Primland. (Decl. of Penny Morgan ¶¶ 20–27, Mar. 23, 2018 [ECF No. 85].) The evidence is thus in conflict over whether Primland actually cares whether its employees lie, or even lie under oath, or whether its argument is a naked attempt to avoid certain damages. See McKennon, 513 U.S. at 362–63.

Primland asserts that lying about tape-recording conversations is grounds for dismissal, and cites cases for the proposition. See, e.g., Bodoy v. N. Arundel Hosp., 945 F. Supp. 890, 899 (D. Md. 1996), aff'd 112 F.3d 508 (4th Cir. 1997). But that argument ignores the relevant inquiry. It does not matter that *some* employer *somewhere* would terminate an employee for that conduct; it matters whether *this* employer would have terminated *this* Plaintiff for that conduct. Here, Plaintiff has certainly raised a factual dispute as to whether "dishonesty" is grounds for termination at Primland or not. Primland's Motion for Partial Summary Judgment will be denied.

## IV. CONCLUSION

There is evidence to suggest that Plaintiff was treated different "because of" her sex. While Primland has offered a legitimate, nondiscriminatory reason for its actions, the weight of the evidence, at this stage, undercuts its reasoning. Accordingly, summary judgment is not warranted, and the question of what motivated Bouvier, and therefore Primland, will be for the jury to decide.

As to Plaintiff's Motion for Partial Summary Judgment, the evidence is in conflict as to whether or to what extent Plaintiff's past financial difficulties or dishonesty would have impeded her employment at Primland. Because a jury could find either way, Plaintiff's Motion for Partial Summary Judgment on the issues of damages will be denied.

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to all counsel of record.

**ENTERED** this 13th day of July, 2018.

        s/Jackson L. Kiser
        SENIOR UNITED STATES DISTRICT JUDGE